# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

NOE DAMACIO ARCAUTE,

Defendant-Appellant.

UNPUBLISHED
April 21, 2015

No. 319667
Ingham Circuit Court
LC No. 13-000299-FC

Before: OWENS, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of second-degree murder, MCL 750.317, carrying a concealed weapon (CCW), MCL 750.227 and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to 225 to 720 months' imprisonment for the second-degree murder conviction, a concurrent term of 18 to 60 months for the CCW conviction, and 24 months for the felony-firearm conviction, consecutive to his second-degree murder conviction. We affirm.

## I. BACKGROUND

This case stems from an altercation at the "Save On Market" convenience store on New Year's Day, during which several men were shot, including Nicholas Jones who was mortally wounded. Three groups of men were involved, each of which entered the store around 2:00 a.m. The first group to arrive intended to buy liquor after leaving a house party. Soon after the second group arrived, Keith Houston, a member of the second group, had a discussion with Delvanta Mitchell, a member of the first group. Keith Houston testified that while holding a gun, he told Mitchell that he did not like one of Mitchell's acquaintances and that he was going to shoot the acquaintance when and where he found him. Mitchell denied that Keith Houston showed him a gun or threatened to kill his friend. Group three, which included defendant and codefendant Delon Miller, entered the store last. Charles Mattox, a member of group one, testified that he and defendant exchanged dirty looks after which defendant said that he "had a Magic Johnson for anybody," which Mattox understood to mean that defendant was armed with a gun and clip holding 32 bullets.

Soon thereafter, a fight broke out. One of the combatants, Alim Muhammad, testified that while he was being hit by multiple people, he pulled out a knife and started "stabbing air" with his eyes "basically closed." Keith Houston testified that he was standing near the door

-1-

when the fight began, with his back to the fight. He said he turned around when he heard a commotion and took a couple steps closer to watch. As he was approaching the fight, Keith Houston testified, he saw Miller "come back shooting" after "[a] couple, like seconds." Keith Houston said he was shot while trying to run away.

Jerome Houston testified that he was standing by the cash register when the fight broke out, and "then all of a sudden a gun came up" and he heard shots fired. Jerome Houston said Miller shot first, aiming at Tyrazes Brown and Shawon Calvin, and fired two shots before Brown pulled out a gun and returned fire. Jerome Houston estimated that Miller and Brown each fired a total of five or six rounds while inside the store. Jerome Houston said Miller approached him, pointed his weapon at him and pulled the trigger, but that defendant's gun "didn't go off anymore." Jerome said defendant then bent over near the victim, who was shot and lying on the ground, and said, "they shouldn't have jumped on me" and "sorry." Jerome Houston said he then went back to his car while defendant and another man exchanged fire by their respective vehicles. Medical evidence established that the victim was shot on the left side of his chest, and that the bullet entered his body "closer to his back than to his front." Medical evidence also established that Brown sustained gunshot wounds to the chest and arm, Terreon Smith was wounded in his leg and buttocks, and Keith Houston had a gunshot wound to his leg.

Several residents of a house located next to the store testified to what happened outside of the store. One witness said she saw a group of people running from the store after hearing two gunshots. The witness testified that two men then exited the store, with the bigger man exchanging gunfire with someone else while he and his companion were standing behind a van. Three witnesses testified that a third man approached the smaller of the two by the van and shot him in the back. The smaller man was defendant.

Portions of the video surveillance footage from the store were played during trial, with Lansing Police Department Detective Mark Lewandowsky providing narration. The officer testified that he spent 30 to 40 hours reviewing the videos and could identify the people shown in the videos based on his investigation of the case and personal interactions with many of them. In one segment taken from inside the store, Lewandowsky testified, defendant can be seen with his hand on a long, metallic object tucked horizontally in his waistband, which appeared to Lewandowsky as the handle of a pistol and a magazine. Lewandowsky also testified that the video showed Miller separating himself from the "fighting mass of people" and then he and defendant going down to the end of an aisle, where defendant handed something to Miller. According to Lewandowsky, the footage shows Miller going back to the front of the store and raising his arms. Seconds later, the officer explained, the victim is seen falling to the floor. Lewandowsky further testified that Miller is seen a few seconds later holding a gun with an "extra long magazine protruding from the bottom of the gun" and Brown attempting to shoot Miller. According to Lewandowsky, defendant is observed hiding by a cooler while these shots were fired. Lewandowsky said exterior video footage showed five people with guns, including Miller.

II. ANALYSIS

Defendant first argues that reversal is warranted because there was insufficient evidence to sustain his conviction for second-degree murder on an aiding and abetting theory. This Court

-2-

reviews sufficiency of the evidence issues de novo. *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010).

"To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, [appellate courts] review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (citation and internal quotation marks omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowak*, 462 Mich 392, 400; 614 NW2d 78 (2000). Further, "[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime," *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (citation and internal quotation marks omitted), and "there is absolutely nothing wrong with conviction[s] built on inferences derived from circumstantial evidence . . . ," *People v LaFountain*, 495 Mich 968, 969; 844 NW2d 5 (2014) (citation and internal quotation marks omitted).

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* at 464. A person who aids or abets in the commission of a second-degree murder may be convicted and punished "as if he had directly committed such offense." MCL 767.39. To convict a defendant under an aiding and abetting theory, the prosecution must prove beyond a reasonable doubt three elements:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 7; 715 NW2d 44 (2006) (citation and internal quotation marks omitted).]

Defendant first argues that his conviction under an aiding and abetting theory cannot stand because there was insufficient evidence to convict Miller of second-degree murder, explaining that it is not clear whether Miller killed Jones without justification or excuse.[1] We conclude that there was ample evidence supporting the finding that Miller shot Jones without justification or excuse.

Our Supreme Court discussed justifiable homicide in *People v Riddle*, 467 Mich 116, 119; 649 NW2d 30 (2002), stating as follows:

---

[1] Miller was actually convicted of first-degree premeditated murder, MCL 750.316(1)(a).

-3-

As a general rule, the killing of another person in self-defense by one who is free from fault is justifiable homicide if, under all the circumstances, he honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force. The necessity element of self-defense normally requires that the actor try to avoid the use of deadly force if he can safely and reasonably do so, for example by applying nondeadly force or by utilizing an obvious and safe avenue of retreat.

There is no evidence supporting defendant's position that Miller reasonably believed he needed to use deadly force to avoid imminent danger of death or great bodily harm. Although the evidence showed that Miller was punched during a brawl between several men who were carrying guns, video surveillance footage showed that Miller and defendant were able to remove themselves from the brawl and retreated to safety behind the end of an aisle inside the store. At that point, there was no evidence suggesting that Miller or defendant was in imminent danger of any harm. To the contrary, Miller left this place of safety and returned to the brawl.

Moreover, there was no evidence that Miller could have reasonably believed he faced death or great bodily harm, or that using deadly force was necessary. The evidence suggested that Jones was armed while inside the store, and although the testimony showed that other men in the store possessed guns, there was no evidence that these guns were displayed to Miller or defendant in a threatening manner before Miller opened fire. There was no evidence that any shots were fired until Miller returned to the brawl—after retreating—and opened fire.

Moreover, Miller's malice is evident from the manner in which he opened fire. Although defendant contends that Miller shot Jones and others in self-defense, the physician who examined Jones after the shooting opined that Jones was mortally wounded from a bullet that entered his body "closer to his back than to his front." Further, testimonial, medical, and video evidence showed that Miller shot his victims as they were attempting to run away.

Additionally, evidence regarding statements Miller made after shooting Jones further indicate that he shot Jones and others in retaliation for being punched, rather than in self-defense. Indeed, Miller was heard telling Jones after shooting him, "they shouldn't have jumped on me." Additionally, the jury heard evidence that Miller gave two statements to a police detective after the shooting, during which he concealed his involvement in the shootings and never once stated that he feared for his life or shot someone in self-defense. In sum, there was an absence of evidence that Miller shot Jones with justification or excuse and an abundance of evidence that he did so with malice.

Alternatively, defendant argues that there was insufficient evidence that he aided and abetted a second-degree murder because he did not aid or encourage the shooting and could not have reasonably known that Miller would use his gun to shoot anyone. This argument is without merit. First and foremost, video evidence showed defendant handing Miller the murder weapon—without hesitation—moments after Miller had been punched, and after previously announcing that he "had a Magic Johnson for anybody," meaning a gun and clip holding 32 bullets. The video evidence also showed defendant hiding for some 25 seconds after handing Miller his weapon, which supports the conclusion that he knew Miller planned to use the weapon.

-4-

Defendant also argues that the trial court committed error in declining to depart below the sentencing guidelines. Defendant was sentenced within the guidelines. Because defendant does not claim that the guidelines were improperly scored or that sentencing was predicated on inaccurate information, appellate review of this issue is precluded under MCL 769.34(10).

Affirmed.

/s/ Donald S. Owens
/s/ Kathleen Jansen
/s/ Christopher M. Murray